**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                :

THE CONFEDERATION OF NORTH,        :
CENTRAL AMERICAN AND CARIBBEAN   :     No.
ASSOCIATION FOOTBALL               :
                                :

            Plaintiff,       :
                                :      **COMPLAINT**
      -against-             :   **JURY TRIAL DEMANDED**
                                :

AUSTIN JACK WARNER, CHARLES BLAZER,  :
SPORTVERTISING (NY), SPORTVERTISING   :
(CAYMAN), EN PASSANT LTD., EN        :
PASSANT INC., MULTISPORT GAMES      :
DEVELOPMENT INC.,               :
                                :

           Defendants.     :
                                :
-------------------------------------------------------------X

        Plaintiff, the Confederation of North, Central American, and Caribbean Association

Football ("CONCACAF" or "Plaintiff"), brings this suit against Defendants Austin "Jack"

Warner ("Warner"), Charles "Chuck" Blazer ("Blazer"), and several shell entities used by

Warner and Blazer to effectuate their schemes including but not limited to Sportvertising (NY),

Sportvertising (Cayman), En Passant Ltd., En Passant Inc., Multisport Games Development Inc.

(the "Blazer Entities") (collectively, the "Defendants").  CONCACAF seeks damages to redress

the harms caused by Warner and Blazer's fraudulent, unfair and unlawful acts as former high-

ranking officials of CONCACAF.  Those acts include accepting bribes and kickbacks from

CONCACAF's business partners in exchange for awarding lucrative contracts to those partners

without the knowledge of CONCACAF's Executive Committee or Congress.  Warner and Blazer

also sold CONCACAF's vote to select the host of the 2010 World Cup in exchange for bribes for

their personal enrichment in violation of their fiduciary duties owed to CONCACAF.   Blazer, using several shell entities, including the Blazer Entities, pilfered CONCACAF's coffers by misappropriating CONCACAF funds, including by transferring CONCACAF funds to his personal accounts and using CONCACAF funds for personal expenses including several luxury apartments located in New York.

Both Warner and Blazer were charged with criminal racketeering, wire fraud, money laundering and other crimes in connection with these and other widespread and pervasive criminal activities that victimized CONCACAF in a series of criminal proceedings filed by the United States Department of Justice (the "DOJ") in this Court, including  the Indictment unsealed by the DOJ on May 27, 2015 in the matter captioned *United States of America v. Webb et al.*, Cr. No. 15-252 (RJD), as well as the Superseding Indictment captioned *United States of America v. Hawit et al.*, Cr. No. 15-252 (RJD) in that same matter unsealed on or about December 3, 2015, as well as the Information (the "Information")  filed by the DOJ in the matter captioned *United States of America v. Charles Gordon Blazer*, 13-Cr-602 (RJD) on November 25, 2013, which was not unsealed until June 15, 2015.

On June 6, 2015, Blazer pled guilty to criminal charges alleged in the Information, including to 18 U.S.C. § 1962 (c) for engaging in patterns of racketeering activity which included multiple acts of wire fraud (18 U.S.C. § 1343); money laundering and money laundering conspiracy (18 U.S.C. §§ 1956, 1957), and interstate and foreign travel in-aid-of racketeering (18 U.S.C. § 1952).  Other charges Blazer pled guilty to include wire fraud conspiracy, money laundering conspiracy, income tax evasion and willful failure to file reports of foreign bank and financial accounts all of which were in connection with the bribery schemes that are the subject of this complaint – in addition to other criminal acts.   A copy of the

November 25, 2013 Information regarding the charges against Blazer and the transcript of Blazer's guilty plea and allocution are attached hereto as Exhibits A and B, respectively.

In his allocution, Blazer admitted his guilt to all ten of the counts he was charged with, stating that "[d]uring my association with FIFA and CONCACAF, among other things, I and others agreed that I or a co-conspirator would commit at least two acts of racketeering activity." Blazer further admitted that "in or about 1993 and continuing through the early 2000s, I and others agreed to accept bribes and kickbacks in conjunction with the broadcast and other rights to the 1996, 1998, 2000, 2002 and 2003 Gold Cups." The Gold Cup is CONCACAF's premier bi-annual tournament of its member association national football teams, and the media rights associated with that tournament generate substantial revenue for CONCACAF. Blazer further admitted that "in or around 2004 and continuing through 2011, I and others on the FIFA executive committee agreed to accept bribes in conjunction with the selection of South Africa as the host nation for the 2010 World Cup." Virtually throughout his entire time as a CONCACAF official, Blazer admitted that he and is co-conspirators served as "fiduciaries to both FIFA and CONCACAF," and that "in contravention of our duties…agreed to use e-mail, telephone and a wire transfer out of the United States in furtherance of the scheme." At least one of these improper payments "passed through JFK Airport in the form of a check."

Blazer also engaged in numerous acts of fraud and breaches of fiduciary duty by improperly charging CONCACAF millions of dollars in unauthorized commissions and fees based on commercial rights agreements CONCACAF entered into with media rights companies to exploit various CONCACAF properties, including the Gold Cup, and by charging CONCACAF for personal expenses, ranging from rent payments for his lavish apartments in the

Trump Tower on Fifth Avenue, to purchasing a condominium in Miami, to purchasing a Hummer H2 vehicle, among other things.

Warner and Blazer were able to get away with this illegal and improper conduct for so long because they took affirmative steps to avoid detection by, among other things, maintaining front companies into which they deposited the illegal bribe payments, controlled information about CONCACAF's books and records, and were protected by high-ranking CONCACAF officials who, unbeknownst to CONCACAF, also were involved in improper conduct with Warner and Blazer.

There can be no doubt that Warner and Blazer victimized CONCACAF, stealing and defrauding it out of tens of millions of dollars in brazen acts of corruption for their own personal benefit at the expense of the entire  CONCACAF region.

## JURISDICTION AND VENUE

1.      This Court has federal jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332 (a)(2), 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

2.      Venue is proper under 28 U.S.C. § 1391(b)(2) and (c), because a substantial part of the events or fraudulent acts, breaches of fiduciary duty, and omissions in furtherance of the conspiracy, which form a substantial part of the events giving rise to Plaintiff's claims, were committed in the Eastern District of New York.  During his allocution, Blazer also admitted that venue in the Eastern District of New York was proper with respect to the criminal acts he committed that are alleged in this complaint.

## PARTIES

3.      Plaintiff CONCACAF is a not-for-profit football organization that administers sports regionally across 41 member associations, and is one of six confederations that are part of the Fédération Internationale de Football Association

("FIFA").  Headquartered in Miami, Florida and incorporated in the Commonwealth of the Bahamas, CONCACAF manages regional competitions, provides training and fosters development and youth football programs.

4.     Defendant Warner, an individual, is the former President of CONCACAF from 1990 through 2011 when CONCACAF maintained its headquarters in New York City.  From 1983 through 2011, Warner also served as the President of the Caribbean Football Union referred to below as the "CFU."  On information and belief, Defendant Warner, is a citizen of Trinidad and Tobago, and a former FIFA Vice-President.

5.     Defendant Blazer, an individual, is the former General Secretary of CONCACAF from 1990 through 2011 when CONCACAF maintained its headquarters in New York City.  Blazer is a United States citizen.

6.     At all relevant times, on information and belief, Defendant Sportvertising (NY) was a corporation organized and existing under the laws of New York with its principal place of business in Scarsdale, New York.

7.     At all relevant times, on information and belief, Defendant Sportvertising (Cayman) was a corporation organized and existing under the laws of the Cayman Islands with its principal place of business in Georgetown, Grand Cayman, British West Indies.

8.     At all relevant times, on information and belief, Defendant En Passant Ltd. was a corporation organized and existing under the laws of New York with its principal place of business in New York, New York.

9.     At all relevant times, on information and belief, Defendant En Passant Inc., was a foreign corporation  organized and existing under the laws of the Cayman

Islands or Panama with its principal place of business in either or both of those jurisdictions.

10.     At all relevant times, on information and belief, Defendant Multisport Games Development Inc. was a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.

11.     At all relevant times, on information and belief, Defendants Sportvertising (NY), Sportvertising (Cayman), En Passant, Ltd., En Passant Inc., and Multisport Games Development Inc. were shell companies and alter egos of Blazer, and operated under his sole direction.  Blazer used the Blazer Entities, and possibly other front companies as vehicles of fraud and not for legitimate business purposes, and none of them had business operations but were used as vehicles for laundering the proceeds of illegal and fraudulent activities.  Defendants' acts and omissions have been collectively committed by all Defendants and in concert with each other.

## FACTUAL ALLEGATIONS

## THE ENTERPRISE

12.     FIFA and its six constituent continental confederations (including CONCACAF), together with affiliated regional federations, national member associations, and affiliated sports marketing companies, collectively constituted an "enterprise," as defined in 18 U.S.C. § 1961(4), that is a group of legal entities associated in fact (hereinafter the "enterprise").  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise which affected interstate and foreign commerce.  The principal purpose of the enterprise was to regulate and promote the sport of football

worldwide.  The enterprise operated in the Eastern District of New York and elsewhere
including overseas.

13.     The principal purpose of the enterprise was to regulate and promote the
sport of soccer worldwide.  The members of the enterprise carried out this purpose by
using a variety of methods and means, including creating and enforcing uniform
standards and rules, organizing international competitions and commercializing the media
and marketing rights associated with the enterprise.  The enterprise operated in the
Eastern District of New York and elsewhere, including overseas, and frequently engaged
in banking and investment activities with United States financial institutions.

14.     FIFA, CONCACAF and the other regional federations and national
member associations often entered into contracts with sports marketing companies to
commercialize the media and marketing rights to various soccer events, including the
World Cup, CONCACAF's Gold Cup and other tournaments, World Cup and Olympic
qualifiers, friendlies as well as other rights associated with the sport of football.  Often
operating in connection with affiliated consultants and intermediaries, these sports
marketing companies, including multinational corporations with headquarters, offices and
affiliates located in the United States, often acquired an array of media and marketing
rights, including television broadcasting rights, advertising rights, sponsorship rights and
ticketing rights.  These rights were then subsequently sold to sub-licensees and television
and radio broadcast networks, and sponsors including those located in the United States.

15.     The revenue generated by the commercialization of the media and
marketing rights associated with football constituted an essential source of revenue for

the enterprise.  The United States was an increasingly important and lucrative market for the commercialization of these rights.

16.     The enterprise as alleged in this complaint is also detailed in the  DOJ's Indictment and Superseding Indictment, charging 41 individuals and entities with allegations of widespread racketeering, fraud and conspiracy involving kick-backs, money laundering and embezzlement.  Informations filed by the DOJ against other defendants, including Blazer, also describe the enterprise in a substantially similar fashion as the above allegations.

## FIFA

17.     FIFA is the international governing body of organized football.  FIFA is composed of 209 member associations, each representing organized football in a particular nation or territory, including the United States.  The term "football" as used herein refers to what in the United States is often referred to as "soccer," but throughout the rest of the world it is commonly referred to as "football."  Each of FIFA's member associations also are members of one of the six continental confederations: CONCACAF, CONMEBOL, UEFA, CAF, AFC and OFC.

18.     FIFA's premier event is the World Cup, a competition played every four years that determines which nation is the world champion of football.  The World Cup is by far the most popular sporting event in the world.  In the lead up to the World Cup, FIFA's member federations participate in regional World Cup qualifying matches.  From those matches, 32 nations qualify for the World Cup tournament, which is played across a single month at various venues within a host nation.

19.     At times relevant to this complaint, the host nations for various editions of the World Cup were selected by means of a vote of the FIFA Executive Committee.  The

FIFA Executive Committee consisted of 24 members—the President (elected by the FIFA Congress) and 23 members (elected by the six confederations, including one Vice President from each confederation, with certain exceptions). Typically at least six years prior to each World Cup, the FIFA Executive Committee held a vote in which its members cast their votes via secret ballot.

20.     Since 2004, the FIFA Code of Ethics required football officials to recognize their fiduciary duties to FIFA, the confederations, and member associations while performing their duties. The FIFA Code of Ethics mandates that "[w]hile performing their duties, officials shall avoid any situation that could lead to conflicts of interest." FIFA's Code of Ethics always has required its officials and members to adhere to a standard of "absolute loyalty." In addition, accepting bribes or participating in bribery, or proceeding with transactions in which football officials have undisclosed conflicts of interest are also expressly barred. Violations of the FIFA Statutes or the Code of Ethics can subject football officials to sanctions, including provisional suspensions or permanent bans from football-related activities.

21.     By 2009, the FIFA Code of Ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

22.     FIFA's Statutes specifically require that the confederations, including CONCACAF, comply with and enforce FIFA's Statutes and the regulations and decisions of FIFA. FIFA's Statutes further require that the confederations adopt their own statutes which must be submitted to FIFA for approval, include certain minimum provisions, and comply with principles of good governance. In 2015, shortly after the release of the

Indictment, both Warner and Blazer were banned from all football-related activity for life by FIFA.

## CONCACAF

23.     CONCACAF is the continental governing body of association football in North America, Central America and the Caribbean, and, since 1994, has been incorporated as a not-for-profit corporation in Nassau, Bahamas.  CONCACAF is composed of 41 member associations, each representing organized football in a particular nation or territory in North America, Central America, and the Caribbean.

24.     At all times relevant to this complaint, CONCACAF maintained its principal administrative office located in New York, New York, where Blazer was based from 1990 through 2011.

25.     Since 1990, CONCACAF's directors and officers were regulated by the Bahamas Companies Act.  As President and General Secretary of CONCACAF, Warner and Blazer owed, under the Bahamas Companies Act, fiduciary duties to the organization.  These duties include a duty of care and loyalty, a duty to act bona fide in CONCACAF's best interests, a duty to refrain from self-dealing or from usurping corporate opportunities, and a duty to perform their functions honestly and in good faith for the interest of CONCACAF.

26.     Since 2006, the CONCACAF Statutes have explicitly listed among the objectives of the organization "[t]o ensure that the bodies and Officials of CONCACAF and its Member Associations observe the statutes, regulations, decisions, disciplinary code and code of ethics of FIFA and CONCACAF."  In his guilty plea allocution Blazer further admitted that "[he] and others who were fiduciaries to both FIFA and CONCACAF, in contravention of our duties….agreed to participate in a scheme to

defraud FIFA and CONCACAF of the right to honest services by taking undisclosed bribes."

27.     CONCACAF manages competitions, offers technical and administrative training courses for football clubs and actively promotes the development of football throughout the region.  On a biennial basis, CONCACAF hosts and arranges the Gold Cup, a month-long tournament for the region's national football clubs hosted across 13 different cities in the United States.  In the past, and in CONCACAF's upcoming 2017 Gold Cup tournament, CONCACAF has hosted guests and players who travel through this District and in New York, while holding matches at Met Life Stadium.  CONCACAF also hosts and arranges an annual Champions League tournament in which the best professional football clubs in the region participate.  CONCACAF holds an annual meeting of its Congress, attended by representatives from each of the member associations, staff and other delegates.

28.     At times relevant to this complaint, CONCACAF was managed by an Executive Committee, which acted akin to a board of directors.   At the relevant times, CONCACAF's day-to-day operations were controlled and managed by the President, an officer elected by the member associations to engage in executive decision-making on behalf of the ExCo.  CONCACAF appoints a General Secretary charged with assisting the President and the ExCo in administering CONCACAF.

29.     Prior to April 2016, CONCACAF had three member seats on the FIFA Executive Committee.   The CONCACAF President served as a FIFA Vice President and a member of the Executive Committee, and CONCACAF had two additional member

seats on the FIFA Executive Committee.  Warner and Blazer each occupied these seats to

the FIFA Executive Committee during all times relevant to this complaint.

30.     CONCACAF, as a confederation of FIFA, is bound by certain obligations,

including, among other things, that they comply with and enforce FIFA's Statutes,

regulations and work closely with FIFA to further FIFA's objectives.  CONCACAF

officials are bound by FIFA's code of ethics which since inception in 2004 has prohibited

any football "officials," from accepting bribes for personal gain.  Since 1992,

CONCACAF's Statutes have incorporated FIFA's Statutes and have mandated that the

Statutes and Regulations of FIFA must be followed.  Officials of FIFA, CONCACAF,

and other soccer governing bodies are bound by fiduciary duties to their respective

organizations.

31.     Warner, as CONCACAF President, and Blazer, as General Secretary,

therefore owed fiduciary duties to CONCACAF as the respective organization for which

they served, and by extension owed fiduciary duties to FIFA as Executive Committee

members.

**WARNER AND BLAZER**

32.     In 1990, CONCACAF was a small organization with limited cash-flows

due to the lack of popularity of football within the United States.  However, over the next

decade, the popularity of football increased significantly in the region, and in so doing

unfortunately attracted individuals seeking to profit from it.  Warner, who was already

the president of one of CONCACAF's sub-confederations known as the Caribbean

Football Union (the "CFU"), sought the CONCACAF presidency in 1990.  In 1990,

Warner campaigned for CONCACAF president and, with the support of Blazer, who was

an official in the United States Soccer Federation, was elected.  Warner subsequently

appointed Blazer has CONCACAF's General Secretary.  Warner and Blazer worked

closely to engage in negotiations for bribes and kickbacks in connection with lucrative

broadcasting rights for tournaments including CONCACAF's Gold Cup.

33.     Warner, and Blazer used consulting agreements and offshore bank

accounts for their benefit, including the Blazer Entities, to cover up their schemes.  One

of many tactics which Blazer already admitted were used to "promote and conceal my

receipt of bribes and kickbacks."  For example, Warner signed a consulting agreement

with Blazer's entity known as Sportvertising to offer Blazer 10% commission on all

broadcasting agreements signed on behalf of CONCACAF with sports marketing

companies.  Over the course of twenty years, Blazer funneled CONCACAF funds to the

Blazer Entities.

34.     Both Warner and Blazer remained in their positions until public scandals

related to other's conduct caused them to resign in or around late 2011.

35.     Warner and Blazer, as co-conspirators, corrupted the enterprise by

engaging in various criminal activities, including fraud, bribery, and money laundering in

pursuit of personal and commercial gain.  Warner and Blazer also participated in the

corruption of the enterprise by conspiring with and aiding and abetting each other in the

abuse of their positions of trust and the violation of their fiduciary duties.

36.     Together, the Defendants engaged in conduct designed to prevent

detection of their illegal activities, to conceal the location and ownership of proceeds of

those activities, and to promote the carrying on of those activities.  This conduct included

the use of "consulting" agreements and other contractual arrangements to create an

appearance of propriety for illicit payments as well as the creation and use of shell

companies, nominees and numbered bank accounts in tax havens and other secretive

banking jurisdictions.  The Defendants sought to pillage CONCACAF from the inside,

seeking endless ways to embezzle funds from the organization.

37.     Warner and Blazer's willingness to betray CONCACAF and the sport of

football in their "pay to play" schemes of bribes is described in the DOJ's 47-count

indictment, unsealed by the DOJ on May 27, 2015 in the matter captioned *United States*

*of America v. Webb et al.*, Cr. No. 15-252 (RJD), as well as the Superseding Indictment

captioned *United States of America v. Hawit et al.*, Cr. No. 15-252 (RJD) in that same

matter unsealed on or about December 3, 2015, as well as the Information obtained by

the DOJ in the matter captioned *United States of America v. Charles Gordon Blazer*, 13-

Cr-602 (RJD) on November 25, 2013, which was not unsealed until June 15, 2015 (the

"Information").  Both Warner and Blazer were charged with criminal racketeering, wire

fraud, money laundering and other crimes in connection with these and other widespread

and pervasive criminal activities that victimized CONCACAF.  The Indictment and the

Superseding Indictment detail Warner and Blazer's participation in a  racketeering

conspiracy spanning twenty years in which the Defendants executed a vast scheme where

the corruption of the enterprise became endemic.

38.     The Defendants used the enterprise in continuance of a RICO conspiracy

to defraud football confederations and launder money for their own personal benefit.  The

common participants in the racketeering conspiracy included, among others, Defendant

Warner and Defendant Blazer who used their influence in the world of football to extract

bribes from media rights companies and to pilfer funds belonging to CONCACAF.   In

fact, the illegal acts engaged in by Warner and Blazer were part of a much larger

racketeering conspiracy, in which Warner and other criminal defendants charged in various indictments and/or informations obtained by the DOJ in this Court – many of whom already have pled guilty – engaged in serial and unabated fraud and corruption to victimize CONCACAF and its constituents while Warner, Blazer and the other defendants greedily lined their own pockets.

39.     On November 25, 2013, Blazer pled guilty to racketeering conspiracy charges in relation to his participation in the enterprise.  In the Information filed by the DOJ against Blazer, the government charged Blazer with numerous crimes, including racketeering conspiracy predicated on multiple acts of wire fraud, money laundering, travel in-aid-of racketeering as well as separate charges for conspiracy to commit wire fraud and conspiracy to launder money.  The court "accept[ed] the plea of guilty counts…inclusive of the information" which along with other evidence discovered by CONCACAF provides the basis for the factual allegations concerning the Gold Cup Scheme and 2010 World Cup Scheme below.

## GOLD CUP SCHEME

40.     In support of charges against both Blazer and Warner in the above referenced indictments, the DOJ alleged that in or about 1993, Warner and Blazer entered into negotiations with a sports marketing and media company (the "Sports Marketing Company") for the sale of CONCACAF's television and broadcast rights in connection with the Gold Cup tournament.  During the course of the negotiations, Warner, Blazer and the representative of the Sports Marketing Company agreed to bribe payments in six-figure sums to be paid to Warner and Blazer personally in exchange for their agreement to award the contract to the Sports Marketing Company.  Warner and Blazer accepted the

offer and took the bribes while causing CONCACAF to enter into the contract with the Sports Marketing Company in October 1994.

41.     Blazer executed the agreement with the Sports Marketing Company in August 1994 and CONCACAF's Executive Committee that the proposed agreement was "very attractive and should result in additional benefits for both the participating countries and CONCACAF."  The agreement provided the Sports Marketing Company with total and exclusive ownership of all broadcasting and marketing rights for three Gold Cup tournaments.  Blazer did not disclose the "six-figure" bribe he received in exchange for executing the contract with the CONCACAF Executive Committee.  In his allocution, Blazer admitted that "[he] and others agreed to accept bribes and kickbacks in conjunction with the broadcast and other rights to the 1996, 1998, 2000…Gold Cups." Likewise, the principal of the Sports Marketing Company pled guilty to Indictment charges and also admitted in his guilty plea allocution that he was the one who paid the bribe, stating that he "made bribe and kickback payments" to "soccer officials" for the Gold Cup contracts during the relevant period.

42.     Again, for CONCACAF's 2002, and 2003 Gold Cups, Warner and Blazer conducted negotiations in New York, among other places.  During this period, the Sports Marketing Company's representatives paid hundreds of thousands of dollars in bribe and kickback payments to be wired into accounts controlled by Warner and Blazer.  Blazer in his guilty plea allocution admitted to receiving these payments as well stating that "he and others…accept[ed] bribes and kickbacks in conjunction with the broadcast and other rights" contained in the contracts covering the "2002[] and 2003 Gold Cups."

16

43.    Neither Warner nor Blazer disclosed to the CONCACAF Executive Committee that these agreements were procured through the exchange of bribe payments.

44.    At times, Blazer received the bribes on behalf of both himself and Warner which were later split between them pursuant to an understanding that Warner had with Blazer.  For example, on or about March 29, 1999, the Sports Marketing Company caused $200,000 to be wired to an account at a Caribbean bank held in the name of an entity controlled by Blazer in the Cayman Islands called Sportvertising Inc. Approximately three weeks after the bribe payment, on or about April 23, 1999, Blazer wire transferred $100,000 to a bank account controlled by Warner.  No disclosure of this bribery or any of the payments made by the Sports Marketing Company was ever made to the CONCACAF Executive Committee.

45.    In February 2003, following the receipt  of another such wire transfer in the amount of $600,000, which was also credited to Blazer's Cayman account held in the name of Sportvertising, Blazer received a letter from his bank asking that he provide the source of funds, along with supporting documents.  To conceal the nature of the payment Warner, Blazer and a representative from the Sports Marketing Company created a sham contract for consulting services to conceal the nature of the payments.

46.    On multiple occasions, Blazer acting pursuant to his common understanding with Warner about bribe payments received from the Sports Marketing Company, continued to share portions of bribe payments and kickbacks with Warner.

## 2010 WORLD CUP SCHEME

47.    The Defendants coordinated a much larger bribe scheme in connection with the World Cup tournaments whereby Warner and Blazer agreed to sell their votes

for the 2010 World Cup selection process and then pass through payments of the bribes through at least one of the Blazer Entities, namely the Sportvertising entities.

48.     In or about 2004, Warner and Blazer, as members of the FIFA Executive Committee, were part of the small group of FIFA representatives that would select the host of the 2010 World Cup.  Warner was a FIFA Vice President representing CONCACAF at the FIFA Executive Committee.  Blazer as a FIFA Executive Committee member was also eligible to vote for the host nation.  Both Warner and Blazer were serving in positions on the FIFA Executive Committee designated for members from CONCACAF.   The FIFA Statutes expressly provided that CONCACAF is apportioned one FIFA vice-president position, and two FIFA Executive Committee membership positions.   The FIFA Executive Committee was considering several locations to host the global tournament including Morocco, South Africa, and Egypt, among other nations.

49.     In the months before the vote, Warner and Blazer, travelled to Morocco where a representative of the Moroccan bid committee offered to pay $1 million to Warner in exchange for his agreement to cast his secret ballot on the FIFA Executive Committee in favor of Morocco to host the 2010 World Cup.

50.     Warner, in his efforts to extract even more money from global football, and to further denigrate the integrity of CONCACAF's vote, informed Blazer that Warner was offered an additional bribe for his vote.  Warner informed Blazer that South Africa and its government was prepared to arrange a $10 million bribe to an organization setup and controlled by Warner exclusively to receive illicit payments.  As part of the conspiracy, Warner agreed to provide Blazer with $1 million of the $10 million bribe.

51.     Unsurprisingly, when the FIFA Executive Committee vote was held on May 15, 2004, South Africa was selected over Morocco to host the 2010 World Cup. Warner and Blazer both voted for South Africa.  Warner was subsequently provided the $10 million from South Africa.  Blazer, acting pursuant to their common scheme and understanding, told Warner that he wanted his $1 million portion of the $10 million bribe payment.

52.     Warner then worked with other high-ranking FIFA officials to facilitate the transfer of the $10 million dollars.  Several letters discovered as a result of the Superseding Indictment show that Warner, using carefully coded language, arranged for the $10 million payment to be sent to an account he controlled veiled as a payment "to the legacy program for the Diaspora and specifically for the Caribbean Countries."  On December 7, 2007, Warner and Blazer jointly emailed a FIFA official to follow up on the payment which was then sent to accounts controlled by Warner in the name of the CFU and CONCACAF.

53.     Warner used bank accounts held in the name of to make payments to Blazer.  As mentioned above, at the time, Warner was also President of the CFU.  Warner paid Blazer in three installments, totaling $750,000.  The first payment took place on December 19, 2008 from a Caribbean bank account held by the CFU.  On December 19, 2008, Warner wire transferred $298,000 from the CFU account to Blazer's account held in the name of Blazer's Sportvertising company.

54.     Warner executed a second payment for $205,000 via a check drawn from the same account controlled by Warner and held in the name of the CFU.  Blazer caused the check to be deposited at his bank account in New York City.  Warner sent Blazer an

email evidencing such payment and advising Blazer beforehand that the payment was on its way.

55.     The third and final payment that actually was made was in the amount of $250,000. The check was delivered by hand to Blazer from an individual who travelled from Warner's country, Trinidad and Tobago. Blazer provided the check to an individual who travelled from the Bahamas to pick the check up and travelled back to the Bahamas to deposit the check on May 3, 2011. In connection with this payment, Warner sent an email advising Blazer that the payment was forthcoming.

56.     In his allocution, Blazer admitted that he, with Warner, "agreed to accept bribes in conjunction with the selection of South Africa as the host nation for the 2010 World Cup. Among other things, [his] actions…had common participants and results." Blazer further admitted in his allocution to receiving the payments described above stating that "[he] and others agreed to and transmitted funds by wire transfer and checks from places within the United States to places in the Caribbean, and from places in the Caribbean to places in the United States. [He] agreed to and took these actions to, among other things, promote and conceal my receipt of bribes and kickbacks. [He] knew that the funds involved were the proceeds of an unlawful bribe, and [he] and others used wires, e-mails, and telephone to effectuate payment of and conceal the nature of the bribe. Funds procured through these improper payments passed through JFK Airport in the form of a check."

**OTHER FRAUD AND BREACHES OF FIDUCIARY DUTIES BY BLAZER**

57.     In another scheme involving the enterprise, but not covered by the DOJ's Indictments or the Information, CONCACAF discovered that both Warner and Blazer

employed similar tactics for embezzling and misappropriating CONCACAF funds, as those described in the Gold Cup and World Cup schemes.

58.     Warner, in exchange for Blazer's support during his presidential campaign, caused CONCACAF to enter into an agreement with Sportvertising in 1990 after Warner was elected president of CONCACAF (the "Sportvertising Contract").  The Sportvertising Contract was later renewed in 1994 with a termination date set for July 17, 1998.  While Blazer originally received authorization from the CONCACAF Executive Committee to compensate himself in the form of commission in 1990, Blazer, as a fiduciary of CONCACAF, failed to obtain authorization for any compensation paid after the expiration of the Sportvertising Contract on July 17, 1998.  Notwithstanding his obligation to get approval for his compensation, Blazer paid himself steadily increasing amounts in the form of commissions and fees for an additional thirteen years after the expiration of the Sportvertising Contract – none of which was properly disclosed to the CONCACAF Executive Committee.

59.     Blazer accrued millions of dollars in commissions and fees which were not authorized under either of the Sportvertising Contracts.  Notwithstanding the fact that these commissions and fees were unauthorized, as discussed above, Blazer also admitted to receiving bribe payments on top of the compensation he assigned himself from CONCACAF.

60.     In order to conceal such payments from the CONCACAF Executive Committee and to obfuscate the total amount of his unauthorized compensation, Blazer paid commissions and fees not just to Sportvertising but to several other Blazer Entities. For example, Blazer caused CONCACAF to pay En Passant Inc., and En Passant Ltd.,

nearly $2.5 million in commissions from 1996 through 2011.  From 2004 through 2011,

Blazer caused CONCACAF to pay $6 million in commissions to Multisport Gaming

Development.  Blazer also paid "fees" to these entities including an additional $1.7

million to En Passant Inc., and En Passant Ltd., as well as $760,000 in fees to Multisport

Gaming Development.  As with the Sportvertising entities involved in the Gold Cup and

World Cup schemes above, these entities simply existed to receive payments on behalf of

Blazer.  CONCACAF's former controller who executed these payments described them

as "shell companies" to act as fronts for Blazer's payment of moneys.  Blazer also

structured these payments into smaller tranches to avoid detection.

61.     The capstone of Blazer's fraudulent self-payments occurred in November

2011, shortly after he was implicated in a separate scandal involving Warner.  When

Blazer was asked by an Executive Committee member about his compensation in 2011,

Blazer lied and told the Committee that he expected to earn $2 million – Blazer's

compensation for 2011 was almost $5 million.  When Blazer was informed that the

Executive Committee planned to terminate him, he subsequently wired a $1.4 million

payment to Sportvertising Cayman, the first payment he had made to the entity since

1996.

## BLAZER'S MISUSE OF CONCACAF ASSETS

62.     Blazer also misused CONCACAF assets in connection with several other

transactions and purchases, including: (i) payment of rent on Trump Tower apartments;

(ii) the purchase of two Miami condos; (iii) purchase of Bahamas apartment; (iv)

purchase of a Hummer H2 vehicle; and (v) payments made to an American Express credit

card account for Blazer's personal expenses.

63.     From 1996 through 2011, CONCACAF made recurring payments for rent

on three separate trump tower apartments associated with Blazer.  Two of the apartments

functioned consecutively as Blazer's residences.  From 1996 through 2000, CONCACAF

made rent payments in connection with apartments 64/65C of the Trump Tower, and

from 2001 through 2011, CONCACAF made rent payments to an apartment on the 49th

floor of the Trump Tower.  Blazer caused CONCACAF to pay his landlords a collective

amount of over $1.5 million in rent.  While some of these charges were deducted from

accounts payable to Blazer for "commissions," which he claimed he had earned, Blazer

also caused CONCACAF to incur separate charges such as $6,000 per month in rent for

one of the Trump Tower apartments as a "business expense."  Despite contentions by

Blazer that this was a business expense, Blazer actually used this apartment to house his

girlfriend and her children who had moved into the residence at the time when

CONCACAF paid the rent.  At another point in time the extra apartment was allegedly

used to house Blazer's cats.

64.     Blazer also used CONCACAF funds to purchase two apartments in

Mondrian South Beach Hotel Residences in May 2010.  Blazer purchased these

apartments for $810,000 and they were primarily used by Blazer.  Blazer purchased the

apartments in the name of CONCACAF's marketing and television division known as

CMTV.  Blazer never sought the CONCACAF Executive Committee's approval for the

purchase of these apartments.  Moreover, Blazer not only had a fiduciary duty to disclose

such purchases, but he also violated the CONCACAF Statutes which required Blazer to

seek authorization from the Executive Committee.  While the apartment arguably could

have been used for employees travelling to CONCACAF's nearby office, most employees did not even know that CONCACAF owned those apartments.

65.     In the Bahamas, Blazer also caused CONCACAF to spend $1.4 million on an apartment at the Atlantis Paradise Resort.  To purchase that apartment, Blazer used funds known as FAP which were provided to CONCACAF for development purposes.  Such funds are sent to CONCACAF by FIFA and are intended for the development programs for football, not to support Blazer's luxurious personal lifestyle.  While Blazer contemplated purchasing two apartments using CONCACAF funds, he ultimately purchased a single apartment debiting CONCACAF $910,000 for the down payment.  An additional $497,500 which was debited from his "commissions" which Blazer claimed were owed to him at the time despite the fact that such payments were made several years after the Sportvertising Contract expired.

66.     Blazer also went so far as to purchase a 2004 Hummer H2 vehicle in June 2005 for $48,554 using CONCACAF funds.  Blazer caused CONCACAF to pay between $600 and $660 per month to park the vehicle in a garage near the New York office.  Blazer and his girlfriend, who was not a CONCACAF employee, were listed as the drivers of the Hummer on CONCACAF's automotive insurance policy.  The vehicle which CONCACAF employees believed was used for Blazer's use, did not have a legitimate business purpose.

67.     Finally, Blazer continued to comingle his assets with that of CONCACAF through the use of his American Express card.  Blazer incurred over $29 million in expenses which were incurred on his American Express account from 2004 through 2011.  While Blazer used this card for CONCACAF expenses and accommodations for

CONCACAF business, over $3 million were Blazer's personal expenses.  Blazer claimed that he allocated these expenses on his own, and the CONCACAF Executive Committee had no oversight over Blazer's allocations and CONCACAF was never able to verify the veracity of Blazer's accounting.

## WARNER AND BLAZER'S CONCEALMENT

68.     Warner and Blazer actively concealed the amount of Blazer's compensation and the amounts of money travelling out of CONCACAF's accounts into Warner or Blazer's personal accounts.  The concealment of these payments within the accounting and financial records of CONCACAF occurred through Blazer's use of the Blazer Entities as a pass-through to pay himself.  Blazer paid himself through the Blazer Entities, instead of paying himself directly so that such payments were not associated with him on financial statements.  Blazer also structured his payments into smaller less conspicuous amounts to avoid detection in CONCACAF's accounting and financial records.  Warner assisted Blazer by providing a close associate of Warner as CONCACAF's auditor.

69.     Blazer and Warner represented that the financial statements he provided to the Executive Committee and the Congress were subject to independent audits, when he knew that such representation was completely false.  The auditor, arranged with Warner's help, did not engage in a normal audit – had a proper audit been conducted of CONCACAF's financial statements, Blazer's compensation would have been disclosed clearly in the financial statements, and could have allowed CONCACAF's Executive Committee to stop or modify Blazer's compensation.

70.     Blazer also went to great lengths to conceal his commission payments and personal expenses by burying such costs under the category of Administrative and

General expenses without any further explanation of the budgets or financial statements provided. Moreover, both Blazer and Warner maintained complete control over CONCACAF's finances. While Warner aided and abetted Blazer's misappropriation of funds by shirking his duties as the most senior executive of CONCACAF, Blazer similarly looked the other way with regards to Warner's many frauds against CONCACAF.

71.     Warner and Blazer in concealing the nature of financial transactions, acted within their own best interest and breached their fiduciary duties to CONCACAF while defrauding the Executive Committee to further enrich themselves. Warner and Blazer did not disclose any of these payments to the Executive Committee because it they knew it was unlikely that such compensation would continue. Blazer's comingling of his personal assets with those of CONCACAF on top of his profligate personal spending was also actively concealed in CONCACAF's financial statements.

72.     Warner, who was CONCACAF's most senior executive at all relevant times, was responsible for overseeing CONCACAF's financial condition. Instead of fulfilling his responsibilities, Warner actively aided and abetted Blazer's actions by assisting Blazer in the presentation of financial statements to the Executive Committee, as well as selecting his personal accountant to provide the auditing services for CONCACAF which assisted in concealing the nature of the payments. The lack of independence of the auditor was important to both Warner and Blazer because it enabled each of them to act in their own self-interest without accountability. No doubt, Warner had a vested interest in seeing to it that his co-conspirator Blazer's activities were not

discovered by the Executive Committee as it would have risked his own ouster due to their joint involvement in the bribery schemes mentioned above.

73.     Although both Warner and Blazer resigned by the end of 2011, it was never disclosed or discovered, until May 27, 2015, the date the Indictment was unsealed, that Warner and Blazer actively solicited and received bribes in connection with their roles at CONCACAF, and as part of the scheme continued to "promote and conceal [his] receipt of bribes and kickbacks," as Blazer stated in his allocution.  Moreover, certain high-ranking CONCACAF officials acted as co-conspirators with Warner and Blazer following Warner and Blazer's resignations, preventing CONCACAF from taking the necessary legal action at an earlier point in time.  Those officials continued to assist in the fraudulent concealment of Warner and Blazer's conduct until they were ousted from their positions after the DOJ's Indictment was unsealed.

## FIRST CAUSE OF ACTION
### *Violation of 18 U.S.C. 1962(c) (Civil Rico) Against Warner, Blazer and Sportvertising (Cayman)*

74.     Plaintiff CONCACAF restates, realleges and incorporates by reference paragraphs 1 through 73 as if fully stated herein.

75.     Plaintiff CONCACAF is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

76.     Defendant Warner is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

77.     Defendant Blazer is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

78.     Defendant Sportvertising (Cayman) is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

79.     At all times relevant to these claims, Warner was the President of CONCACAF, and his co-conspirator Blazer was the General Secretary.

80.     At all times relevant to these claims, Warner and Blazer acted through the enterprise within the meaning of 18 U.S.C. §§ 1961 and 1962.  Warner and Blazer shared a common purpose of engaging in criminal activity, within a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents.

81.     The common criminal purpose of the criminal enterprise was to personally enrich Warner and Blazer by systematically defrauding Plaintiff CONCACAF.  Warner and Blazer did so pursuant to a preconceived scheme to misappropriate values associated with media rights contracts into their personal bank accounts and/or the bank accounts of their front companies, including but not limited to Sportvertising (Cayman), ultimately deflating the value of the rights paid to CONCACAF – a scheme to which Blazer pled guilty in connection with his criminal proceeding in this very Court.

82.     At all times relevant to these claims, Warner and Blazer through CONCACAF engaged in activities which affected interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

83.     The pattern of racketeering activity engaged in by Warner and Blazer, consisted of numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957 to defraud CONCACAF of the right to honest services by taking undisclosed bribes prohibited by New York State Penal Law Sections 180.3 and 180.08. Specifically, Warner and Blazer conspired to cause CONCACAF to accept lower values for media rights contracts so that they could personally enrich themselves by receiving

undisclosed bribes from media rights companies.  Warner and Blazerthen split portions of

those bribes.  Bribe payments and communications were transmitted and communicated

by means of wire communications in interstate and/or foreign commerce.

84.     From in or about 1991 through 2011, Warner was the President of

CONCACAF.

85.     From in or about 1991 through 2011, Blazer was General Secretary of

CONCACAF.

86.     Warner and Blazer operating under the guise of CONCACAF, executed

media rights contracts with sports marketing companies in exchange for bribes,  contracts

which Warner and Blazer claimed to have procured for Plaintiff CONCACAF's benefit.

87.     The communications and negotiations of such bribes were sent by email,

facsimile, and telephone.

88.     Warner and Blazer shared the proceeds of the bribes via wire transfer.

89.     Warner and Blazer paid and shared the proceeds of the bribes by directing

individuals to travel from outside the United States, to the Eastern District of New York,

to collect proceeds of the bribe.

90.     The value of the contracts was decreased in part by the value of the bribes

Warner and Blazer took from the Sports Marketing Company.   CONCACAF also was

further harmed by Warner and Blazer selling CONCACAF's media rights to the relevant

Gold Cups to the Sports Marketing Company at below-market values, among other forms

of damages suffered by CONCACAF to be proven at trial.

91.     Warner and Blazer at all relevant times between 1993 and 2011 were primarily responsible for negotiating and executing the media rights contracts on behalf of CONCACAF, pursuant to their fiduciary duties.

92.     Warner and Blazer at all relevant times between 1993 and 2011 were primarily responsible for voting and representing CONCACAF at FIFA Executive Committee meetings, including meetings to select the host of the World Cup.

93.     The acts of racketeering activity referred to hereinabove constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), and were related to each other by virtue of common participants, a common victim (CONCACAF), a common method of commission, and the common purpose and common result of defrauding Plaintiff CONCACAF and enriching the conspirators at Plaintiff CONCACAF's expense while concealing fraudulent activities.

94.     The pattern of racketeering activity engaged in by CONCACAF, Warner and Blazer, numerous predicate acts of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and conspiracy to launder money (18 U.S.C. § 1957) in violation of 18 U.S.C. § 1962(c).  Facts relating to these predicate acts are all alleged herein.

95.     Plaintiff CONCACAF was injured as a result of Warner's violation of 18 U.S.C. § 1962(c).  All injuries suffered by Plaintiff CONCACAF stem from Blazer and Warner's unlawful mail fraud, wire fraud and money laundering schemes.

96.     Specifically, Blazer and Warner sent fraudulent information by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers.  The fraudulent information was false when transmitted, known to be false when transmitted, and it was transmitted with the

calculated purpose of defrauding Plaintiff CONCACAF.  Further, Plaintiff CONCACAF, through its Executive Committee detrimentally relied upon the fraudulent information.

97.     For example, on or about March and April 1999, Warner caused Plaintiff CONCACAF to enter into a contract with the Sports Marketing Company for broadcasting rights for CONCACAF's Gold Cup tournament.  In exchange, Warner and Blazer received hundreds of thousands of dollars in bribe payments transmitted via wire payments made from or through banks based in the United States.  This payment and related communications constituted violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy).

98.     Blazer pled guilty to charges of criminal racketeering concerning his actions in connection with the alleged acts as also charged in Blazer's Information.  As such, he is liable for his admitted conduct and estopped from raising any such defenses for his conduct.

99.     As a result of the misconduct of Warner and Blazer, through CONCACAF, the Defendants Warner, Blazer and Sportvertising (Cayman) are liable to Plaintiff CONCACAF for their losses in an amount to be determined at trial.

100.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff CONCACAF is entitled to recover threefold its damages, along with recovery of their costs and attorneys' fees expended in prosecuting this action as a result of Warner and Blazer's pattern of racketeering activity.

## SECOND CAUSE OF ACTION
### *Violation of 18 U.S.C. 1962(c) (Civil Rico) Against All Defendants*

101.     Plaintiff CONCACAF restates, realleges and incorporates by reference paragraphs 1 through 100 as if fully stated herein.

102.     Plaintiff CONCACAF is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

103.     Defendant Warner is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

104.     Defendant Blazer is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

105.     Defendant Sportvertising (NY) is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

106.     Defendant Sportvertising (Cayman) is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

107.     Defendant En Passant Ltd. is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

108.     Defendant En Passant Inc. is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

109.     Defendant Multisport Games Development Inc. is, and at all times relevant to these claims was, a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

110.     At all times relevant to these claims, Warner was the President of CONCACAF and Blazer was the General Secretary.

111.     At all times relevant to these claims, Warner and Blazer acted through the enterprise within the meaning of 18 U.S.C. §§ 1961 and 1962.  Warner and Blazer shared a common purpose of engaging in criminal activity, within a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents.

112.    The common criminal purpose of the criminal enterprise was to personally enrich Warner and Blazer by systematically defrauding Plaintiff CONCACAF.  Warner and Blazer did so pursuant to a preconceived scheme to misappropriate values associated with media rights contracts into their personal bank accounts and/or the bank accounts of their front companies, including but not limited to Sportvertising (Cayman), ultimately deflating the value of the rights paid to CONCACAF – a scheme to which Blazer pled guilty in connection with his criminal proceeding in this very Court.

113.    At all times relevant, Warner and Blazer through CONCACAF engaged in activities which affected interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

114.    The pattern of racketeering activity engaged in by Warner and Blazer consisted of numerous acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and money laundering and money laundering conspiracy in violation of 18 U.S.C. §§ 1956 and 1957.  Specifically, Warner and Blazer conspired to cause CONCACAF to execute onerous contracts for "consulting" services with the Blazer and Sportvertising (NY) and Sportvertising (Cayman).  Warner and Blazer wired portions of funds paid to Blazer and the Blazer Entities to foreign bank accounts, and subsequently defrauded the CONCACAF Executive Committee by not properly disclosing such payments, and fraudulently representing that such payments were not part of Blazer's compensation. Negotiations and payment of these funds were transmitted and communicated by means of wire communications in interstate and/or foreign commerce.

115. From in or about 1991 through 2011, Warner was the President of CONCACAF.

116.    From in or about 1991 through 2011, Blazer was General Secretary of CONCACAF.

117.    Warner and Blazer operating under the guise of CONCACAF, operated an elaborate scheme to embezzle and launder illicit funds using sham consulting agreements to pay commissions to Blazer using CONCACAF funds associated with the profits received from media rights agreements.

118.    The communications and negotiations of Blazer's compensation as well as the embezzlement and laundering of funds out of CONCACAF by Warner and Blazer were conducted via email, telephone and facsimile.

119. Warner, Blazer and the Blazer Entities paid and shared the proceeds of the embezzled and laundered funds via wire transfer of CONCACAF's funds to bank accounts associated with Warner, Blazer or the Blazer Entities.

120.    Warner and Blazer paid and shared the proceeds of the funds by directing individuals to travel from outside the United States, to the Eastern District of New York, to deposit and transfer the proceeds of their illicit scheme.

121.    Warner and Blazer at all relevant times between 1993 and 2011 were primarily responsible for entering into contracts on behalf of CONCACAF.

122.    Warner and Blazer at all relevant times between 1993 and 2011 were responsible for overseeing CONCACAF's finances and serving as stewards of CONCACAF's bank accounts.

123.    The acts of racketeering activity referred to hereinabove constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), and were related to each other by virtue of common participants, a common victim (CONCACAF),

a common method of commission, and the common purpose and common result of defrauding Plaintiff CONCACAF and enriching the conspirators at Plaintiff CONCACAF's expense while concealing fraudulent activities.

124.    The pattern of racketeering activity engaged in by CONCACAF, Warner and Blazer, numerous predicate acts of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956),  and conspiracy to launder money (18 U.S.C. § 1957) in violation of 18 U.S.C. § 1962(c).  Facts relating to these predicate acts are all alleged herein.

125.    Plaintiff CONCACAF was injured as a result of Warner and Blazer's violation of 18 U.S.C. § 1962(c).  All injuries suffered by Plaintiff CONCACAF stem from Warner and Blazer's unlawful mail fraud, wire fraud and money laundering schemes.

126.    Specifically, Warner and Blazer sent fraudulent information by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers.  The fraudulent information was false when transmitted, known to be false when transmitted, and it was transmitted with the calculated purpose of defrauding Plaintiff CONCACAF.  Further, Plaintiff CONCACAF, through its Executive Committee detrimentally relied upon the fraudulent information, including fraudulent representations by Warner and Blazer that CONCACAF routinely underwent independent audits and that the audited financial statements accurately portrayed all of CONCACAF's expenses.  However, the audits were conducted by Warner's associate, and did not reveal that payments made to the Blazer Entities were in fact payments made to Blazer.

127.    For example, in 1990, Warner and Blazer caused Plaintiff CONCACAF to enter into a contract with Blazer's Sportvertising entities in exchange for Blazer's help in Warner's presidential campaign.  Blazer received a 10% commission on all media rights agreements as well as other fees paid to him – an arrangement that was never disclosed to the CONCACAF Executive Committee.  After the Sportvertising Contract expired in 1998, Warner continued to breach his fiduciary duties by allowing Blazer to make payments to himself through, among others, the Blazer Entities, totaling 10% or more of the value of various broadcasting agreements without disclosing such payments to the Blazer Entities to the Executive Committee and actively concealing such compensation in CONCACAF's financial statements for nearly twenty years.  These payment and related communications constituted violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy).

128.    As a result of the misconduct of Warner and Blazer, through CONCACAF, the Defendants are liable to Plaintiff CONCACAF for their losses in an amount to be determined at trial.

129.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff CONCACAF is entitled to recover threefold its damages, along with recovery of their costs and attorneys' fees expended in prosecuting this action as a result of Warner and Blazer's pattern of racketeering activity.

### THIRD CAUSE OF ACTION
*Fraud Against All Defendants*

130.    Plaintiff CONCACAF restates, realleges and incorporates by reference paragraphs 1 through 130 as if fully stated herein.

131.     From in or about 1993 and continuing through in or about 2011, Warner falsely and fraudulently deprived CONCACAF of honest services and fair market value for its broadcasting rights when he agreed to receive bribes in exchange for causing CONCACAF to enter into contracts with media rights companies.

132.     At all times relevant, the Blazer Entities were created for a fraudulent purpose and were the alter ego of Defendant Blazer.

133.     Warner and Blazer engaged in fraud by obtaining, through deception and with the intent to defraud, the commercial rights of CONCACAF.  Warner and Blazer embezzled such fraudulently acquired funds because as CONCACAF's most senior officials, they were entrusted with the commercial rights of the confederation but, with intent to defraud, they accepted bribes in exchange for those rights and converted a portion of the value of those rights to their own use.

134.     Warner and Blazer engaged in fraud by accepting, through deception and with intent to defraud, bribes in exchange for casting their votes in favor of South Africa's bid for the 2010 World Cup.

135.     Warner and Blazer accepted $10 million in bribes in exchange for their vote for the host of the World Cup in 2010.  Blazer admitted that he and others on the FIFA Executive Committee agreed to accept bribes in connection with the selection of the World Cup 2010 host.  Warner and Blazer received these bribe payments for their personal benefit.  Warner and Blazer committed fraud by accepting through deception and with intent to defraud, bribes in exchange for their votes.

136.     Warner and Blazer engaged in fraud by consistently issuing financial statements which contained material misrepresentations and omissions, and in doing so,

provided false information to the Executive Committee about CONCACAF's financial condition and the disposition of assets, namely unauthorized payments made to Warner, Blazer and the Blazer Entities.

137.     Warner and Blazer engaged in fraud by falsely representing that the CONCACAF financial statements were subject to independent audits, when in fact they both knew that the auditor used by CONCACAF was not independent and did not engage in activities one would normally associate with an audit.  This inspired false confidence in the CONCACAF Executive Committee about CONCACAF's financial condition. This left Warner and Blazer free to act in their own self-interests, without detection or oversight.  Specifically, the financial statements failed to identify compensation paid to Blazer and instead opaquely labeled such compensation as "Commissions," thereby impeding the Executive Committee from tracking or evaluating Blazer's expenses over time.

138.     At all times mentioned herein, Warner and Blazer committed fraud. Blazer had direct knowledge of the amount and manner in which he was compensated by CONCACAF and knew that the information was inadequately reported in the financial statements.

139.     As a direct and proximate cause of the fraud committed by Warner and Blazer, Plaintiff CONCACAF suffered the loss of millions of dollars due to Warner and Blazer's misuse of funds, including without limitation the improper payment of commissions and fees and improper reimbursement of personal expenses to the Blazer Entities.  Moreover CONCACAF did not receive the full value of their broadcasting

rights and suffered reputational harm as a result of Warner's actions causing Plaintiff to suffer damages.

140.    Plaintiff CONCACAF reasonably relied upon Warner and Blazer's representations that the contract value and the selection of the media rights companies were fair and free of corruption, and suffered damages as a result of receiving less than the fair value for the media rights contracts and services received.

141.    The material misstatements and lack of disclosure contained in Warner and Blazer's misrepresentations to the CONCACAF Executive Committee were deceptive in that they led Plaintiff CONCACAF to accept contracts for rights at a deflated value.  This value was less than what Plaintiff CONCACAF was entitled to if Warner and his co-conspirator did not accept hundreds of thousands of dollars in bribes in connection with such contracts.

142.    The total dollar value of the difference between the contracts entered into as a result of Warner and Blazer's schemes and the true value of such contracts to which Plaintiff CONCACAF was entitled is valued at hundreds of thousands of dollars. Plaintiffs are entitled to a judgment awarding damages for such losses and for punitive damages during the period of time that Warner and Blazer pilfered from Plaintiff CONCACAF's coffers in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
#### *Breach of Fiduciary Duty Against Warner and Blazer*

143.    Plaintiff CONCACAF restates, realleges and incorporates by reference paragraphs 1 through 143 as if fully stated herein.

144.    As officers of CONCACAF, Warner and Blazer had a fiduciary duty of care and loyalty, and a relationship of trust and confidence to CONCACAF,

CONCACAF's Executive Committee and CONCACAF's constituents.  Blazer admitted he owed CONCACAF fiduciary duties while he served as its General Secretary.

145.    By causing Plaintiff CONCACAF to enter into media rights contracts as the result of bribes and kickbacks, and not based on Plaintiff CONCACAF's best interest, Warner and Blazer breached their fiduciary duties owed to Plaintiff.  Warner and Blazer failed to act in the best interest of CONCACAF and engaged in clear acts of self-dealing by accepting bribes in exchange for the sale of CONCACAF's commercial rights.  As General Secretary, Blazer was responsible for the management of CONCACAF properties and had a duty to attend CONCACAF's financial matters.  By accepting bribes and allowing Warner to do so, Blazer abdicated his responsibilities as the General Secretary.  Blazer admitted that he and other co-conspirators owed fiduciary duties to FIFA and CONCACAF, and that in contravention of those duties he accepted undisclosed bribes.

146.    By selling Plaintiff CONCACAF's votes in connection with the World Cup host-selection process for 2010, Warner and Blazer breached their fiduciary duties owed to Plaintiff CONCACAF by voting in his own pecuniary interest and against the interest of Plaintiff CONCACAF.  Through their conduct, Warner and Blazer failed to act in the best interests of CONCACAF and engaged in self-dealing by accepting bribes in exchange for their votes as FIFA Executive Committee members.  Warner and Blazer both served on the FIFA Executive Committee as representatives of CONCACAF.  By accepting or paying bribes in exchange for votes, Warner and Blazer deprived CONCACAF and FIFA of those rights to their honest services and to the integrity of the voting process.

147.    Warner and Blazer breached their fiduciary duties to CONCACAF in connection with payments made to Blazer as part of his "compensation" and in connection with Blazer's misappropriation of CONCACAF assets for personal use during his tenure as General Secretary, which included among other things using CONCACAF funds to pay for Blazer's living arrangements.  Warner breached his fiduciary duties by knowingly permitting Blazer to compensate himself without authorization after the Sportvertising Contracts expired and Warner failed to raise the issue with the Executive Committee for more than 13 years.  Blazer breached his fiduciary duties to CONCACAF through his pattern of self-dealing and misappropriation discussed above, which amounted to self-dealing and a failure to act in the best interests of CONCACAF.  Blazer also breached his fiduciary duty to CONCACAF by comingling his personal assets and expenses with CONCACAF business expenses in his American Express account.

148.    As a direct and proximate result of the breaches of fiduciary duty by Warner and Blazer, Plaintiff CONCACAF was damaged.

149.    Plaintiff CONCACAF seeks damages and additional losses resulting from such breaches in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CONCACAF demands judgment in its favor as follows:

a. awarding CONCACAF compensatory damages in an amount to be determined at trial, but not less than $20 million;

b.  awarding CONCACAF treble, and/or punitive damages as well as applicable prejudgment and post judgment interest;

c. awarding CONCACAF the costs, expenses, and attorneys fees incurred in prosecuting this action; and

d. awarding CONCACAF such other and further relief as may be necessary and

appropriate.


Dated:          April 17, 2017
                New York, New York

                                                 /s/ John J. Kuster
                                                John J. Kuster
                                                Timothy J. Treanor
                                                Pouneh Aravand
                                                Richard J. Widmann
                                                SIDLEY AUSTIN LLP
                                                787 Seventh Avenue
                                                New York, NY 10019
                                                Tel:  (212) 839-5300
                                                Fax:  (212) 839-5599
                                                jkuster@sidley.com
                                                ttreanor@sidley.com
                                                paravand@sidley.com
                                                rwidmann@sidley.com

                                                *Attorneys for Plaintiff CONCACAF.*